IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PWB DEVELOPMENT, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-17-387-R |
| | ) |
| ACADIA INSURANCE COMPANY | ) |
| and FRATES INSURANCE & RISK | ) |
| MANAGEMENT, L.L.C., | ) |
| | ) |
| Defendants. | ) |

# ORDER

Before the Court are summary judgment motions by Defendants Acadia Insurance Company (Doc. 56) and Frates Insurance & Risk Management (Doc. 49). Plaintiff PWB Development leases its Oklahoma City property to Kampco Foods. The property sustained a March 2015 fire that caused Kampco's rent to abate during nine months of repairs. Plaintiff alleges that before the fire, it requested Kampco and Frates, Acadia's insurance agent, to add Plaintiff as a named insured to Kampco's insurance policy that covers lost rents. Frates never added PWB to the policy, yet it issued "certificate[s] of property insurance" and "evidence of commercial property insurance" listing PWB as insured under the policy covering "business income." Plaintiff seeks $150,913.29 in lost rents from Defendants for misrepresenting that PWB was covered by the policy and causing PWB to rely on those misrepresentations when it declined to procure its own lost-rents coverage. The Court grants Defendants summary judgment on each of Plaintiff's four claims for the reasons discussed herein.

1

## I. Background

PWB's lease with Kampco requires Kampco to carry "at its own expense" four types of insurance—none of which covers business income or lost rents—for the Oklahoma City property at 2905 West Memorial Road where Kampco operates a Johnny Carino's restaurant. Doc. 49-1, at 7. Kampco must carry (1) "fire and extended coverage insurance" for its "personal property, trade fixtures and merchandise"; (2) "fire and extended casualty coverage" to "cover only the building structure itself"; (3) "public liability insurance"; and (4) "employers' liability workers' compensation insurance." Doc. 49-1, at 7, 20, 23. The lease also requires that PWB be named "as an additional insured" on Kampco's policy for the coverage above. *Id.* at 7. To confirm Kampco's compliance with this provision, Kampco "shall furnish to [PWB] from time to time a certificate or other evidence of such insurance coverage." *Id.* In the case of a fire causing significant damage, rent owed under the lease abates during repairs. *Id.* at 11.

Given that the lease leaves PWB exposed for lost rents, PWB maintained its own insurance policy for lost rents from 2010 to early 2014, when that policy was cancelled. Doc. 60-8; *see* Doc. 49-6, at 2–3; Doc. 49-11, at 2. Without lost-rents insurance, PWB claims that it turned to Defendant Frates for coverage. Betty Massie, PWB's bookkeeper, called Frates' account manager and requested certificates of liability and property insurance showing PWB as an "additional insured" for the 11/29/13–11/29/14 term. Massie Deposition, Doc. 60-25, at 5–6; Docs. 60-9, 60-10. Massie does not remember if she "ever ask[ed] [Frates] to make sure that PWB was covered for lost rents" or if she ever "looked on the form to see specifically whether it showed that it covered lost rent." Doc. 60-25, at

6. Kampco's principal asserts that he "continuously and consistently advised" the principal of PWB's predecessor NorthPointe "that Kampco would not pay to insure against any [of PWB's] business income loss" and that PWB "would need to purchase its own policy covering such loss," but NorthPointe's principal expressly denies that anyone from Kampco ever told him that. Kamp Affidavit, Doc. 49-2, at 2; Hedrick Affidavit, Doc. 60-1, at 1; *see* Hedrick Deposition, Doc. 60-2, at 2.

Nonetheless, Frates issued PWB a certificate of property insurance ("CPI") on February 12, 2014 covering the Johnny Carino's property for the 11/29/13–11/29/14 term and listing PWB as both an "insured" (alongside Kampco) and "certificate holder" on a Valley Forge Insurance Company policy. Doc. 59-11. Below the policy number, the CPI reads "Business Income – Actual Loss Sustained 12 Mo," but oddly the only "covered property" boxes checked are "building" and "personal property," *not* the "business income" and "rental value" boxes. *Id.* The CPI also includes disclaimers characteristic of all forms given to PWB:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
>
> . . . .
>
> THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR

OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

*Id.*

As the end of the policy term neared, PWB's mortgage company contacted Massie to request "new insurance certificates" from PWB showing property coverage for the upcoming term. Doc. 60-13. Massie forwarded the request to Kampco's Frank McGregor and asked him for "proof [of] coverage," again mentioning nothing about lost rents. Doc. 60-14. Kampco submitted an insurance application with Frates on November 25, 2014, and on the 26th Frates requested that Acadia bind Kampco's coverage for the 11/29/14–11/29/15 term. Docs. 59-7, 60-19; *see* Agency-Company Agreement, Doc. 60-26.

Frates then issued a CPI identical to the one above, but this time for the 11/29/14–11/29/15 term with Acadia as the insurance provider. Doc. 59-13. Despite that Acadia only bound insurance coverage for Kampco, the CPI again listed Kampco *and* PWB as "insured" due to what Frates calls "an inadvertent scrivener's error." *Id.*; Doc. 49, at 8; *see* Acadia Policy, Doc. 56-1, at 129.[1] The CPI included the same disclaimers and lack of clarity over coverage for business income or lost rents. Heather Wolf, Frates' account manager on Kampco's Acadia policy, re-issued this erroneous CPI on December 1, 2014

---

[1] Defendant Acadia's counsel offers no excuse for their failure to separate exhibits, name them, or include pin-cites in the briefs to particular documents and page numbers. *See* Doc. 56. The day before dispositive motions were due, Counsel requested a fourth extension of the due date that would not have left enough time to rule on the motions before trial. Doc. 47. When the Court denied that motion, Counsel submitted incomplete work. The Court would have been well within its reason to strike the brief, but it declines to do so in order to keep the litigation on track. ECF Policies & Procedures Manual, Section II(A)(4)(a).

and twice again in February 2016 as PWB was preparing to submit a claim to Acadia. Doc. 49-9; Doc. 59-15; Doc. 59-16; Doc. 60-29, at 1. Frates also issued a November 26, 2014 evidence of commercial property insurance form ("ECPI")—a form "no differen[t]" than the CPI other than it is "more specific" about coverage—for the 11/29/14–11/29/15 term listing PWB as both a "named insured" (alongside Kampco) and "additional interest." Doc. 59-6; Doc. 60-4, at 9. The ECPI's disclaimers are nearly identical, and it marks "business income" as covered, but not "rental value." Doc. 59-6.

Frates also issued a certificate of liability insurance on November 26, 2014, but it only listed Kampco as insured and PWB as a certificate holder, so PWB's Massie contacted Kampco's McGregor again and requested that PWB be added as an additional insured on the policy with waiver of subrogation. Doc. 59-18; Doc. 60-17. McGregor responded that doing so "is not a problem and is within the scope of" Kampco's lease with PWB, but Kampco would have to check with Acadia to see if a subrogation waiver warrants a higher premium. Doc. 60-21. Massie replied that PWB lost "some coverage" on the Johnny Carino's property and is willing to pay extra for the waiver. Doc. 60-23. McGregor forwarded the request along to Frates' managing partner Frank Smith, who responded, "No problem and no charge, I'll forward to Heather [Wolf] . . . and ask that she reissue the certificate reflecting the additional insured status and waiver." Doc. 60-24, at 1. Frates thereafter issued an amended certificate of liability insurance reflecting PWB's "Additional Insured" status and "Waiver of Subrogation in favor of PWB." Doc. 56-1, at 38.

The Johnny Carino's restaurant sustained a significant fire in March 2015 that caused rent to abate until repairs finished in December 2015. Doc. 49-2; PWB Insurance

5

Claim, Doc. 49-4. Kampco settled a claim with Acadia for building repairs and lost business income. Amato Deposition, Doc. 56-1, at 100–01; Doc. 60, at 4–5. PWB filed a claim as well, claiming that as a "named insured" it was entitled to recover "lost rental income in the amount of $150,913.29." PWB Claim, Doc. 60-29, at 1. It attached an erroneous CPI labeling PWB "insured" for the 11/29/14–11/29/15 term, PWB and Kampco's lease agreement, and PWB's schedule of lost rental income and financial statements. *Id.* at 3–34. Acadia denied PWB's claim for three reasons: (1) "PWB is not named or described as an insured on the Schedule of Coverage, . . . Policy forms[,] or endorsements"; (2) the lease did not require Kampco to obtain insurance for PWB's lost rental income; and (3) the erroneous CPI showing PWB as "insured" includes an "information only" disclaimer and "by its very terms does not amend the terms of the insurance policy." Denial Letter, Doc. 59-2, at 2.

Plaintiff PWB brings four claims to recover lost rents. Doc. 1-4. The first is deceit by false representation and the second is deceit by nondisclosure or concealment, both against Defendants Acadia and Frates. *Id.* at 5–6. PWB also alleges a breach of the implied covenant of good faith and fair dealing against Acadia, and negligent failure to procure insurance coverage against Frates. *Id.* at 6–8.

## II. Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. . . . An issue of fact is

'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712–713 (10th Cir. 2014). The moving party bears the initial burden of demonstrating the basis for its motion and of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

If satisfied, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact. *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000). The nonmoving party "may not rest upon mere allegations" in his pleading to satisfy this requirement. *Anderson*, 477 U.S. at 256. Rather, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. "[T]he nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

**A. Deceit Claims v. Acadia and Frates**

Because Acadia did not directly issue the erroneous forms to PWB or advise it of its insured status, the Court must first address whether Frates acted as Acadia's agent when

7

it did so. If Frates was Acadia's agent, Defendants are equally liable for Plaintiff's two deceit claims—deceit by misrepresentation and deceit by nondisclosure or concealment.

1. **Agency**

Acadia argues that Frates's conduct does not bind Acadia because Frates's misrepresentations postdated its time acting as Acadia's "soliciting agent," "one whose power is confined to taking applications of insurance, which, when taken, are to be forwarded to the company for its approval or rejection." *Warner v. Cont'l Cas. Co.*, 534 P.2d 695, 698 (Okla. Civ. App. 1975) (quoting *Phipps v. Union Mutual Ins. Co.*, 150 P. 1083, 1084 (Okla. 1915)); *see* Doc. 56, at 7–8.

It is unclear if Frates was more than just a soliciting agent;[2] regardless, there is sufficient evidence to create a material dispute over whether Frates's representations as to PWB's insured status were made in the course of solicitation. PWB contacted Kampco in October 2014 to request "proof [of] coverage" for the new 11/29/14–11/29/15 term; viewing the evidence in Plaintiff's favor, that could mean proof of PWB's insurance coverage on a new policy. Doc. 60-14. The following month Frates provided PWB exactly that, a November 26, 2014 CPI and ECPI showing PWB as insured. Docs. 59-6, 59-13. Frates made these misrepresentations the same day it requested that Acadia bind Kampco's coverage for the new term, and Frates issued the erroneous CPI again on December 1, 2014. 60-19.

---

[2] Frates was not only "authorized to solicit, receive, bind, execute, and transmit proposals to [Acadia] for insurance contracts," it also had the responsibility to "issue and maintain certificates of insurance," and Acadia paid Frates a commission in part for providing that service. Agency-Company Agreement, Doc. 60-26, at 1; Smith Deposition, Doc. 60-4, at 6; *see* Doc. 59, at 12.

Nonetheless, Acadia maintains that the CPIs and ECPI were not part of Frates's solicitation because Kampco applied for coverage before Frates issued them, and these forms are generally only issued after an application has been submitted and approved. This is contradicted by Frates's account manager Heather Wolf, who testified that she "intended to" and "did" issue the erroneous November 26, 2014 CPI to PWB "in conjunction with the renewal of the insurance policy." Doc. 59-5, at 6. Frates' Frank Smith also testified that the December 1, 2014 CPI was "issued in connection with the sale of the . . . Acadia policy to KampCo." Doc. 59-17, at 2. Even as late as December 4, 2014 after the new policy term began, when Kampco forwarded PWB's request to be added to the policy as an additional insured with a subrogation waiver, Frates responded, "No problem and no charge, I'll . . . ask that [Heather] reissue the certificate reflecting the [changes]." Doc. 60-24, at 1. In other words, Frates appeared to be soliciting—accepting an insurance application and a proposed amendment to the new policy—when it made the misrepresentations at issue. "Therefore, any act done by the agent in connection with the issuing of said policy was the act of the company itself," rendering Acadia liable to the extent of its agent Frates.[3] *Pac. Nat. Fire Ins. Co. v. Smith Bros. Drilling Co.*, 162 P.2d 871, 873 (Okla. 1945).

2. **Deceit by Misrepresentation**

Plaintiff claims that it relied on Frates's misrepresentation regarding its insured status on Kampco's policy when Plaintiff declined to procure its own policy, and as a result

---

[3] Defendant Acadia concedes that Oklahoma law does not demand otherwise. It only addresses agency in "controvers[ies] between the insured or the insured's beneficiary and the insurer," which this is not. 36 Okla. Stat. § 1435.3(A); *see* Doc. 56, at 9.

lost $150,913.29 in abated rents during restaurant repairs. However, Plaintiff fails to present evidence sufficient to create a genuine dispute over the justifiability of its reliance, an essential element of deceit by misrepresentation.

A deceit claim, otherwise known as "common-law fraud," *Gay v. Akin*, 766 P.2d 985, 989 (Okla. 1988), requires (1) a material and false representation; (2) made knowingly false or "recklessly, without any knowledge of its truth"; (3) with the intention that it should be acted upon; (4) which is *justifiably* relied upon; (5) to Plaintiff's detriment. OUJI 18.1; *Rogers v. Meiser*, 68 P.3d 967, 976–77 (Okla. 2003), *superseded by statute on other grounds*, 60 Okla. Stat. § 837; *State ex rel. Sw. Bell Tel. Co. v. Brown*, 519 P.2d 491, 495 (Okla. 1974). "Fraud is never presumed and each of its elements must be proved by clear and convincing evidence," which is "the highest standard of proof that the law imposes in civil cases." *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009); *Kupersteinn v. Hoffman-Laroche*, 457 F. Supp. 2d 467, 471 (S.D.N.Y. 2006). Although "[t]he issue of fraud is generally a question of fact," "summary judgment is appropriate where, under the uncontroverted facts, a plaintiff fails to demonstrate the viability of his claim." *Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1046 (Okla. 2013); *McNeese v. Access Midstream Partners, L.P.*, No. CIV-14-503-D, 2017 WL 972156, at *8–9 (W.D. Okla. Mar. 10, 2017). In weighing summary judgment, whether the jury could rationally find fraud, the Court must consider the high clear-and-convincing-evidence standard of proof. *N. Texas Prod. Credit Ass'n v. McCurtain Cty. Nat. Bank*, 222 F.3d 800, 813 (10th Cir. 2000) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55 (1986); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1243 (10th Cir. 1990)).

Beginning with the satisfied elements, Frates made false representations in the CPIs and ECPI that PWB was insured under Kampco's policy with Acadia.[4] Docs. 49-9, 59-6, 59-13, 59-15, 59-16. These representations were material because had PWB been covered under Kampco's policy, it would have had coverage for lost rents. *See* Acadia Policy, Doc. 56-1, at 129; Doc. 56-2, at 21, 40, 43. Frates did so recklessly, as Defendants present no evidence that Frates ever checked the Acadia policy before making these affirmative representations of coverage. Instead, Frates seems to have relied merely on Kampco's request to issue the forms. Smith Deposition, Doc. 60-4, at 11–12, 15–16; Wolf Deposition, Doc. 60-12, at 4.

Intent is difficult to prove, but Plaintiff presents deposition testimony which, viewed in a light most favorable to Plaintiff, creates a genuine dispute as to whether Frates intended for PWB to rely on these representations. Heather Wolf intentionally issued to PWB the CPI and ECPI forms listing PWB as "insured" and "named insured," and it is unclear why she would have done so if not for PWB to rely on those representations. Doc. 60-12, at 5. Frank Smith admitted "[t]here is a significance" to "telling someone they are an insured," as opposed to a "certificate holder," and he understands that "people are going to rely on

---

[4] Frates managing partner Frank Smith's email that he would ask Heather Wolf to "reissue the certificate reflecting the additional insured status and waiver" was not a misrepresentation to PWB that it would have business income coverage because (1) Smith only emailed Kampco, not PWB, (2) the email said nothing as to the type of insurance coverage, and (3) a waiver of subrogation refers to *liability* insurance, and Wolf only had to "reissue the certificate" because PWB noticed it was not listed as insured on the certificate of liability insurance, whereas the CPIs and ECPIs already showed PWB as insured for property insurance. Doc. 60-24, at 1; *see* Docs. 60-17, 60-20, 60-21, 60-22, 60-23; Doc. 60-25, at 4.

11

the [CPIs]." Smith Deposition, Doc. 60-4, at 5–6. Granted, the CPI and ECPI forms showing PWB as insured include "information only" disclaimers that the forms "do[] not . . . amend, extend or alter the coverage afforded by the polic[y]," but the disclaimers appear directed to the "certificate holder" and "additional interest" parties to the policy. *See, e.g.*, Docs. 49-9, 59-6. The forms list PWB as not only a certificate holder and additional interest, but also as "insured" and "named insured," and they "certify that the policies of insurance listed below have been issued to the insured named above." *Id.* Lastly, Plaintiff relied on these representations. Had Frates not represented that PWB was insured, PWB "would have sought coverage for [lost rents] elsewhere." Doc. 60-1, at 1. Because PWB never procured lost-rents coverage, it lost $150,913.29 in abated rent during fire repairs.[5] Doc. 60-29, at 1–2, 28–33.

But Plaintiff's claim falls short because its reliance was not "justifiable." *Brown*, 519 P.2d at 495. To justifiably rely on Frates's false representations, they "must have been of such a nature and made under such circumstances that the injured party had a right to rely upon it." *Brown*, 519 P.2d at 495. *Cf. Rogers*, 68 P.3d at 976 ("[A] buyer may not be heard to have been deceived by seller's representations by his own voluntary blindness."). Although this standard is far from clear, the Court finds four reasons why PWB could not justifiably rely on the representations that it was insured when it declined to procure its own lost-rents insurance.

---

[5] Frates argues that the lease's rent abatement provision invalidates PWB's claim for damages because it was not entitled to collect rents from Kampco during repairs. Doc. 49, at 10. PWB's inability to collect from a third party under one contract does not bar insurance claims based on separate events against Defendants.

First, the representations were equivocal. Even assuming the forms' disclaimers were insufficient to alert PWB to look to the actual terms of the policy, the forms' discussion of coverage is also ambiguous. The CPIs for the 11/29/14–11/29/15 term have the words "Business Income" typed out below the policy number, but oddly the only "covered property" boxes checked are "building" and "personal property," *not* the "business income" and "rental value" boxes. Docs. 49-9, 59-13, 59-15, 59-16. Similarly, the ECPI marks "business income" as covered, but not "rental value." Doc. 59-6. Frates's Frank Smith testified that people "should be entitled to rely on the fact that" CPIs are accurate; that statement carries less weight for Plaintiff's reliance when the CPIs do not clarify what coverage is owed. Doc. 60-4, at 7. Perhaps the representations' equivocal nature would not have mattered to Plaintiff if it had some other legal or factual reason to assume the policy covered lost rents, but the record shows otherwise.

Second, PWB and Kampco's lease delineates four types of insurance that Kampco was obligated to procure at its own cost with PWB as the additional insured, none of which covers lost rents. Doc. 49-1, at 7, 20, 23. If PWB wanted coverage beyond the scope of the lease requirements, Kampco would have either paid a higher premium for the policy or passed that cost onto PWB, accounting for what PWB previously paid to independently maintain coverage for lost business income until 2014. Doc. 59-10 (Massie speculating that the insurance company that used to cover PWB's lost rents until 2014 "may have written" a lost-rents-only policy for just the Johnny Carino's property "if [PWB] had paid an exorbitant amount of money."); Doc. 60-8; Doc. 49-6, at 2–3; Doc. 49-11, at 2; *see Marlin v. Wetzel County Bd. of Educ.*, 569 S.E.2d 462, 472 (W. Va. 2002) ("[A]n insurance

company should not be made to pay for a loss for which it has not charged a premium."). Kampco did not exceed its obligations under the lease, nor did PWB ever pay a premium.[6] It also makes little sense for a lease that abated the lessee's rent in cases of substantial damage to the property to, conversely, require the lessee to procure insurance for the lessor to cover that very occurrence.

PWB argues that the lease has no bearing on whether it justifiably relied on Frates's misrepresentations, but the terms of the lease are a strong indicator of the parties' expectations. For example, Plaintiff cites a West Virginia case that actually undermines the justifiability of its reliance, *Marlin v. Wetzel County Bd. of Educ.*, 569 S.E.2d 462 (W. Va. 2002). The parties' construction contract included indemnification clauses requiring the defendant to procure for plaintiff a type of insurance coverage that the agent ultimately failed to procure; the agent, like Frates, issued an erroneous CPI showing coverage that the plaintiff relied on to his detriment. *Id.* at 465–67. The Court summarized the "well settled" exception to the rule that estoppel is "inoperable to extend insurance coverage beyond the terms" of the contract—"an insurer may be equitably estopped from denying coverage where *the party for whose benefit the insurance was procured* reasonably relied upon the provisions of an insurance certificate to that party's detriment." *Id.* at 472 (emphasis added) (quoting *Potesta v. U.S.F. & G.,* 504 S.E.2d 135 (W. Va. 1998); *Lenox v. Excelsior Ins. Co.*, 255 A.D.2d 644, 645 (N.Y. App. Div. 1998)). Whereas the construction contract in *Marlin* justified that plaintiff's reliance on a CPI consistent with what he knew he was

---

[6] PWB argues that it offered to pay a premium "for being an additional insured," but that offer referred to liability insurance and the waiver of subrogation. Doc. 60-1, at 1; *see supra* Part II(A)(2), at 11 n.4.

14

owed under the contract, the Johnny Carino's lease designates Kampco, not PWB, as the "party for whose benefit the insurance was procured." *Id.* In other words, PWB had no reason to assume based on the lease that being added to Kampco's policy would mean coverage for lost rents.

Third, PWB concedes it never requested or read the Acadia policy to which it claims coverage. It argues that it had no reason to because of the false representations that labeled PWB insured, but again, those representations were vague at best. In the breach of contract context, "[w]hen a certificate contains this type of [does-not-amend-coverage] disclaimer, 'any conflict between the terms of the certificate and the master policy results in the terms of the master policy being applied to determine the rights and obligations of the parties.'" *True Oil Co. v. Mid-Continent Cas. Co.*, 173 F. App'x 645, 650 (10th Cir. 2006) (unpublished) (quoting *Poling v. N. Am. Life. & Cas. Co.*, 593 P.2d 568, 572 (Wyo. 1979)); *see Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 889 (10th Cir. 1991). This does not necessarily dispose of the issue; after all, this is not a contract dispute and Plaintiff concedes that the policy's terms only cover Kampco. *See* Doc. 59, at 20. However, looking to the justifiability of Plaintiff's reliance, it strains credulity that Plaintiff would expect a certain type of coverage without even requesting the policy to read its terms. *Rogers*, 68 P.3d at 976.

Fourth, PWB never asked for lost-rents insurance—not to Kampco, not to Frates, and not to Acadia. William Hedrick testified that Betty Massie discussed "cancellation of [PWB's] . . . business income coverage" with Kampco in October and November of 2014. Doc. 60-2, at 4. Evidence "must be based upon personal knowledge," and there is no

15

admissible evidence that Massie requested business income coverage from Kampco, Frates, or Acadia. *Bellmon*, 935 F.2d at 1111. PWB internally discussed the need to obtain lost-rents coverage to supplant its cancelled policy; yet, when Massie told Kampco that it wanted to be added as an additional insured with respect to liability coverage, she only referred generally to PWB's loss of "some coverage" on the property. Doc. 60-23; *see* Doc. 49-8.

To summarize, Plaintiff PWB—after receiving Frates' forms ambiguously referring to business-income coverage that is *not* owed to PWB under its lease with Kampco, and having never read the policy or requested lost-rents coverage—believes its decision was "justifiable" not to procure its own lost-rents coverage. Considering all the evidence and Oklahoma's "clear and convincing" standard for proving a claim of deceit by misrepresentation, the Court finds summary judgment appropriate. Doc. 60-4, at 7.

### 3. Deceit by Nondisclosure or Concealment

Neither could a jury find in favor of Plaintiff on its claim for deceit by nondisclosure or concealment. The claim requires Plaintiff to have concealed or failed to disclose a fact "with the intent of creating a false impression of the actual facts in the mind of [Plaintiff]." OUJI 18.2; *see Hubbard v. Bryson*, 474 P.2d 407, 410 (Okla. 1970) ("Under all of the evidence it is conclusive that the defendants intended to and did overreach the plaintiff."). Whereas Plaintiff was able to rely on Defendant's reckless conduct in the deceit by misrepresentation claim, this claim requires intent. Plaintiff offers no evidence that Defendants possessed the requisite knowledge to intentionally deceive Plaintiff. To the contrary, Frates never checked the policy to learn that the CPIs and ECPI were incorrect,

and Acadia did not learn about any of the erroneous forms until PWB filed a claim in 2016 attaching a CPI labeling PWB as insured on Kampco's policy. Defendant Acadia's Undisputed Fact 26 (Doc. 56, at 5; Doc. 59, at 11); Doc. 56-1, at 102. Thus, Defendants are entitled to summary judgment on Plaintiff's claim for deceit by nondisclosure or concealment.

**B. Bad Faith Claim Against Acadia**

Plaintiff cannot show that Acadia violated the "duty to deal fairly and act in good faith *with its insureds*" because PWB was not insured. OUJI 22.1; *Wathor v. Mut. Assur. Adm'rs, Inc.*, 87 P.3d 559, 561–62 (Okla. 2004) (quoting *Christian v. American Home Assur. Co.*, 577 P.2d 899, 902–04 (Okla. 1977) ("A 'special relationship' exists between an insurer and its insured," and that "relationship creates a nondelegable duty of good faith and fair dealing on the part of the insurer."). "The critical question in a bad faith tort claim is whether the insurer had a 'good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding payment under the policy.'" *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 725 (Okla. 2009) (quoting *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000). Acadia's justifiable reason for withholding payment was that the policy terms only cover Kampco, which PWB concedes. Doc. 56-1, at 129; Doc. 59, at 20. To the extent PWB argues that regardless, Frates's deceitful misrepresentations necessitated coverage, that was a close question, and a bad faith claim "does not foreclose the insurer's right to deny a claim . . . 'to which the insurer has a legitimate defense.'" *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (quoting *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109

17

(Okla. 1991)). There is simply no evidence in the record that Acadia acted in bad faith or that had it investigated the claim differently, Plaintiff would not have sustained injury.

## C. Negligence Claim Against Frates

Plaintiff has not shown a genuine dispute as to whether Frates was negligent by failing "to procure the [lost-rents] insurance coverage for PWB." Doc. 1-4, at 8. "[A]n insurance agent may be liable . . . in tort for failure to . . . use reasonable care, skill and diligence in the procurement of insurance . . . if, by the agent's fault, insurance is not procured *as promised* and *the insured* suffered a loss." *Swickey v. Silvey Companies*, 979 P.2d 266, 268–69 (Okla. Civ. App. 1999) (emphasis added). Plaintiff assumes a duty that does not exist between PWB and Frates because Frates never "promised" PWB it would procure business income insurance and PWB is not an "insured" under Kampco's policy. *Id.*; *see* Doc. 60, at 17. Instead, Frates represented to Kampco that it would add PWB as an "additional insured" as to liability coverage. *Supra* Part II(A)(2), at 11 n.4. Frates cannot be negligent for failing to procure insurance that would not have affected Plaintiff's damages in this case.

Even assuming a duty could exist between an insurance agent and uninsured party, Frates cannot be held negligent for ignoring a request that Plaintiff never made. *Hardison v. Balboa Ins. Co.*, 4 Fed. App'x 663, 673 (2001) (unpublished) ("[L]iability under [a negligence] theory [for failure to procure insurance] occurs only where the insured has actually requested coverage from the agent."); *Swickey*, 979 P.2d at 268 ("[The plaintiff] told someone at Agency that she wanted full coverage for Mike, and she wanted him shown as the named insured," and then Mike "called Agency to make sure he was 'the insured of

18

the vehicle' . . . ."). Plaintiff has not shown that it requested business income coverage from Frates, and its only request directly to Frates was for coverage for the 11/29/13–11/29/14 term, which has no bearing on lost rents during the 2015 repairs.[7] Frates's apparent carelessness is troubling, issuing several incorrect insurance forms in 2014 and even again in 2016 after the Johnny Carino's fire, but without a duty to PWB, Frates is entitled to summary judgment on Plaintiff's negligence claim.

### III. Conclusion

Defendants show "that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law" on Plaintiff's four claims for relief. Fed. R. Civ. P. 56(a). Accordingly, the Motions for Summary Judgment, Docs. 49 and 56, are GRANTED.

IT IS SO ORDERED this 27th day of August 2018.

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[7] Each of the cases cited by the *Swickey* court for the principle that an agent can be liable for negligently failing to procure insurance confronts a plaintiff who (1) had a contractual relationship with the insurance agent or (2) made a request for a particular type of coverage directly to the agent before the agent failed to follow through on a promise to provide that coverage. *See Swickey*, 979 P.2d at 268 n.3 (citing *Speir Ins. Agency, Inc. v. Lee*, 281 S.E.2d 279, 281 (Ga. 1981); *Keller Lorenz Co. v. Ins. Assocs. Corp.*, 570 P.2d 1366, 1368 (Idaho 1977); *McAlvain v. Gen. Ins. Co. of Am.*, 780, 554 P.2d 955, 958 (Idaho 1976); *Beavers Ins. Agency, Inc. v. Roland*, 217 S.E.2d 484, 485 (Ga. 1975)). Neither circumstance is present here.